O'NEILL *v.* THE STATE.

1. In a statute declaring it penal to seduce "a virtuous unmarried female," the meaning of the word "virtuous" is for determination by the court, not by the jury. Every virgin is virtuous; and, as a general proposition, a woman who, out of wedlock and with her own consent, has parted with her virginity, is not virtuous.

2. Whether a particular woman had parted with her virginity before the alleged seduction took place is a question for the jury. The affirmative may be established by evidence, direct or circumstantial; and conduct tending to show a debauched mind, the loss of moral chastity, may be considered.

3. The want of moral chastity may also be regarded on the question whether the woman, though a virgin, was really seduced, or whether she shared the intercourse for the gratification of lascivious propensities not inflamed by the arts or importunity of the accused.

4. In trying a charge of seduction, the jury may apply their knowledge of human nature and of the customs of society, to interpret conduct, refer it to its sources, and follow it to its consequences. They may use such knowledge, not to determine what a virtuous woman is, but upon the question whether a particular woman was or was not virtuous (according to the legal standard) at a given time.

5. Intercourse brought about by promise of marriage only, with no aid from persuasion or other false and fraudulent means, will not constitute the offence of seduction, the statutory words being, "If any person shall by persuasion and promises of marriage, or other false and fraudulent means, seduce a virtuous unmarried female," etc.

May 7, 1890.

Seduction.  Criminal law.  Charge of court.  Before Judge WINN (motion for a new trial before Judge

GOBER). Cherokee superior court. September term, 1889.

Albert O'Neill was indicted for seduction of Mary Hall. The evidence was as follows:

Mary Hall: I am a single woman. O'Neill is an unmarried man. He visited me in 1887 and 1888; he quit coming in January, 1888; he come once or twice after that, but not to see me; he visited me ten months. Improper conduct took place between him and me during that time, in Cherokee county, in 1887. It was before I was before the grand jury as a witness in this case. It was in the fall of 1887, at home at my father's house. This conduct occurred in the cook-room; father and mother were at home at the time; it was at night in the kitchen; don't know what time in the night. The kitchen is two or three steps from the dwelling-house. He promised to marry me in Christmas of 1887. He made this promise a month or so before he got me so. Can't tell how long we had been engaged before this thing occurred; a month or so, I think; I won't be positive. He had intercourse with me. No one else had sexual intercourse with me previous to that time.

Cross-examined: Think we moved to the place where we now live in 1883. Young men went with me to Sunday-school and parties about that time. I remember Elisha Frey; he went with me to a singing school one time, about 1883. I don't remember any other young men that went with me about that time. Others went with me from that time on. I don't remember the exact month in which intercourse with defendant took place; it was in November and December; I can't tell you the time in November; I have no idea; I can't tell you. I can't tell you the number of times intercourse took place in November; more than once; twice or three times, I expect. It was not twenty times. Some eight or nine times. It occurred in the cook-

house, about two or three steps from the dwelling. The house is on a settlement road; the kitchen is behind the house. There is a door in front and one back of the dwelling; also a back room to the dwelling, with window at the end; also a door from the back room to the big room of dwelling. There was a door to the kitchen next to dwelling; also a chimney and fireplace. I have four brothers and three sisters. I don't know whether they were at home the night defendant first had intercourse with me; nobody but Pa and Ma and the children were at home, I guess. I can't tell you what kind of a night it was, whether clear or cloudy, he first had criminal intercourse with me. I can't tell you whether the kitchen door was open or shut at the time; don't know whether the back door of the dwelling was open or shut; didn't go to the door to see; I don't know whether either door was open or shut. The sexual intercourse occurred in the kitchen before the fireplace, on a bench. The bench was about one foot wide. I was lying down on the bench. I can't tell where my feet were at the time; my head was on the bench. I did not swear, in the trial of the bastardy case before J. R. Carroll, J. P., and John R. Ross, J. P. & N. P., that my feet were on the bench at the time. Don't know where my hands were. Don't know where defendant's head was; don't know where his feet and hands were. I don't remember whether my parents had retired or not. I reckon my sisters and brothers had gone to bed. I did not see whether the door was open or shut. I agreed to the sexual intercourse; it was agreeable to me. We had been engaged about a month or two when it first took place, I reckon. I don't know the month, nor when and where we were engaged. I think it was in November, 1887, we were engaged; we were then at home. It was September, I think; it was in cotton-picking time. We

first had intercourse in November. I told defendant before Christmas that I put no confidence in him. He said he was going to the marble-works to get work, and he went up there and said he could not get any except in the yard; and I told him he didn't want any job of work; that was before Christmas. He said some one wrote to him from Alabama and he was going, and kept putting it off; and I come to find out that he didn't aim to. Said-he couldn't marry because he had no money. I did not go with Elisha Frey into Sunday-school with leaves and trash on my back, three or four years before; if I did, I didn't know it. I had intercourse with defendant first in November, 1887. I was not in a cyclone pit with John Duke at the place where Terrell Hall lived, in the year 1886. Mr. Hill's daughter did not invite me out of the pit. I did not decline to come out of the pit. Hill's daughter did not call to me to come out of the pit. I did not remain in the pit with John Duke. We were not in the pit; we were just at the door. I did not lay my head in Anderson Maddox's lap while going from a party at William Duke's. Miss Louella Hill was along. I did not first lay my head upon Maddox's shoulder, and afterwards into his lap. I know Will. Brooks; he went with me a time or two; he did not fondle my person in the early part of the fall of 1887, near my house near the spring; he did not put his arms around me nor put his hands on my person; he never did that in his life. He never went with me but once; he never fondled my person in any way. Anderson Maddox, in the early part of the year 1887, never felt of my person; he did not propose sexual intercourse with me at that time. I did not tell him that if he would wait until night, it would be all right. W. H. Grizzell did not, in the year 1886, fondle and toy with my-person and put his hand in my bosom; he never did that at any time. I did not have sexual intercourse

with John Duke on the way from a party at William O'Neill's, in the winter of 1886–87. Duke did not handle my person in any way. I never at any time had intercourse with John Duke. I know John Hilly; he never kept my company; he never went with me in his life; yes, he did one time—the first girl he ever went with, and just went a little piece; that was four or five years ago. I and John Duke did not go into a room of Mr. Hill's house on Sunday evening when Mr. Hill and his wife was away from home, and shut the door. I I have been there lots of times, but that did not occur. I did not run the children away. After Christmas of 1887, I never sent defendant any word about his engagement to marry me. I never sent him any word only when I sent him that note for him to come. After Christmas I tried to get him to carry out his promise to marry me. I never said anything to him particularly about it. He came there in April, 1888, and he said if I done with him like I did before, he would marry me. I told him I would marry him, but that I wouldn't do as I had done. I was induced to have sexual intercourse with the defendant because he promised to marry me.

Re-direct : I don't know how often I tried to get defendant to comply with his promises. He told me he would marry me. I told him that I was not going to have anything to do with him, that he had not complied with his promises, and that a man that would treat a woman that way ought to be hung. I did not mean to slight him ; I would have kept his company ; I meant that I was not going to have sexual intercourse with him. The reason he gave for not complying with his promise was, that I would not do as he wanted. He said he would not marry any woman that would not have to do with him before he married. He tried to force me into it in April, 1888, and would have done it

had it not been for Pa and Ma. He said he would make me do it; that if I would come and go with him, he would marry me, and if I didn't he would not. He wanted me to go somewhere with him. I told him my uncle was coming. He said he wasn't. I got him to look, and he saw him and sat down in his chair.

Re-cross: I did not testify, on the trial of the bastardy case before the magistrate, about his trying to have intercourse with me in April. You never asked me. I swore before the magistrate to tell the whole truth. I never told them what I am telling here. You did not ask me. You never asked me no such questions. You asked me how many times and where at, but you never asked me if he came there or anything about it.

Re-direct: The baby I had in my arms was Albert O'Neill's baby; it is my baby.

Caswell Hall, father of Mary Hall, sworn: Albert O'Neill visited my daughter in 1887; came to see her a number of times. He went once a week, and may be sometimes he would be away two weeks, and sometimes twice a week for several months. There was no other young man going to see her before then.

Cross-examined: John Duke might have passed my house in 1887; I think he stopped there one day; he came in and stayed a little bit. I don't remember how often he was at my house in 1887; he was there in November, 1887, and stopped awhile. I don't think he was there more than once or twice in November. I don't remember that he was ever there in December, 1887. I do not recollect how many times he was there in October. I can't say whether or not Will. Brooks was at my house in September. No other young men were keeping her company at that time. No other came to see her any more than the balance of the family. Duke did not come to see her at that time; if she and

Duke were in a room together at that time, I don't remember it. Duke had been keeping her company two or three years; I don't remember how long. I don't know that I can tell you when Duke quit coming. Don't think Anderson Maddox ever came to see my daughter. I remember having a conversation with William Crowder about this case in July, 1888, near the spring. I did not say to Crowder that for a long time I had been watching for them (O'Neills) to leave down a gap, and that they had left it down, and that I was going to put it up. I might have said they had laid down a gap and I was going to put it up. I can't testify that I told him that revenge was what I wanted and revenge was what I was going to have. I don't pretend to say that I did or did not. I might have told him that I was going to make him support the child.

William Duke, for the defendant: Was present at the trial of the bastardy case before Ross and Carroll, magistrates. Heard Mary Hall testify about this case in that trial. She swore on that trial that when defendant had intercourse with her, her head and her feet were on the bench; that was in November, 1887, that she swore the sexual intercourse took place. I did not hear her say anything about defendant's trying to force her to have anything to with him in April, 1888.

John Carroll: Was the magistrate before whom the bastardy case of Mary Hall against Albert O'Neill was tried. Heard Mary Hall swear about the first time Albert O'Neill had sexual intercourse with her. She said she was lying on a bench ten or twelve inches broad; that was between the last of November and the first of December, 1887. She said her head and feet were all on the bench at the time of the intercourse.

John A. Morgan: I saw Mary Hall in company with Elisha Frey, three or four years ago. I don't remem-

ber the date. I saw them together at Union School-house; they came up to the school-house together. Sunday-school was pretty near over at the time. I saw some trash on the waist of her dress and back at the time. I don't remember the time of the year; it was the season when leaves were green. She lived about one and a half miles from the place.

Cross-examined : I can't tell whether it was three or four years ago. They walked to the school-house. I saw no one else come with them. I was in the house when· they got there. They came in and took their seats; they passed by me. I don't know when I told O'Neill about this; it was some time before the trial of the bastardy case. The bastardy case was tried last spring. I don't recollect telling anybody else. I never saw anything improper between these parties. I don't attach any importance to it. I thought but very little about it anyway.

W. N. Grizzle : Have known Mary Hall three or four years, I reckon. I kept her company a few times. I was in her company before November, 1887; toyed with, felt of her person; it was in 1886. She objected, but I sort of trained her along and broke her in. I am not obliged to tell how I felt of her person. I felt of her and hugged her a little. I felt of her bosom. I don't know that I have to tell where else I felt of her; I felt nearly all over her body; this was in 1886, at her house. I did that three or four times; I don't know how many times. She finally consented for me to do that. One time I came up to the palings, and she came there, and we stood there and talked awhile; and I went under her dress into her bosom. I never had sexual intercourse with her. I proposed to her to have sexual intercourse. She would always put me off She agreed to it at last, but I went off to Alabama. The last time. I was there was the time she agreed to meet me; that was in 1886, the best I can remember.

Cross-examined:  I told  several  of the  boys what took place between me and her.  I don't remember who I told first.    There was Will. Brooks, I believe, and Gilbert Smith, were the first I told.   I told them two or three months after it occured.   We were in Alabama when I told them——me and Will. Gilbert. I told nobody at home but Mr. Hall, when he came to see me last fall.   Albert O'Neill came to me some  time last year, and asked me about it.   I made  an affidavit in the case.   Albert O'Neill got the affidavit, I think; he did have it.   My best recollection is, that I made the affidavit last summer or the first of the fall.   I came back from Alabama last . March a year ago.   I don't recollect whether I made the affidavit before or after the bill was found.   I don't recollect what defendant said about getting up evidence in his case; he never told me he was getting up evidence to beat the case, as I recollect; he asked me if I would give the affidavit, and I told him I would ; he came to see me.  :Harry Smith was with him.   I told Squire Carroll when I signed the affidavit that I had no idea of leaving the country.   I signed the affidavit at Carroll's.   I live  three miles from here.   He came after me, and I went to Esquire Carroll's.   I don't remember that he said anything to me about fixing it up to beat this case.   We were together two or three hours.   I don't know that I recollect anything that he said.   I don't remember that he said anything about Miss Hall.   He had been after me once or twice to sign it.   I didn't have time to go over there at first.   I didn't want to sign the affidavit the first time.   I didn't want to have anything to do with the case.   I don't recollect what he said about Miss Hall when he asked me for the affidavit.   I might recollect something that was said if I was to try to.   I don't think anything about that.   I didn't think I would have to be at court.

Louella Hill: I am the daughter of Mr. Jim Hill.   I

live in this county, about a quarter of a mile from Miss Mary Hall. Three years ago last February, I saw Mary Hall in a cyclone pit with John Duke. Me and my sister and Aunt Mary Butler, John Duke and Mary Hall were in the pit. We went out together; we left John Duke and Mary Hall in there; they remained in there about ten or fifteen minutes. When we came out of the pit, we told her to come out; and after we got outside of the gate we told her to come out, and she didn't do it. We waited for her, and she still didn't come. I saw her and John Duke in our house together. We were in our house together; he shut the door of the room we were all in; the children came out. Duke and Mary Hall were in that room five or ten miuutes.

Cross-examined: We all went into that cyclone pit. When we came out, I went down to her house. The cyclone pit is about a quarter of a mile from her house. I waited a right smart while for her; don't know how long. She staid in the pit five or ten minutes while I was up there in sight of it. She knew I was there. She came to our house after that. I went to see her, and she came to see me, frequently after that. We did not visit each other as we did before this happened. I didn't know how long she visited us after that; it might have been two years. We didn't keep company though, the same as we did. I went to her house. Suppose I staid all night with her; I don't know. I reckou we went to parties together. The reason we did not visit her as before was, that we did not think as much of her. It was three years ago this fall that I was in the room with Mary Hall and John Duke. Father and mother were gone to Marietta. Besides John Duke and Miss Hall, me and Ella, Anderson Maddox and Albert O'Neill were at the house; he came with Anderson Maddox. I don't know who he came to see. Albert O'Neill and Anderson Maddox came there

to buy some goobers from me and my sister. We were out on the porch when Duke and Miss Hall were in the room together, four or five steps from them. Miss Hall knew we were there. I visited her after that occurred. I was sworn in the justice court. I did not tell George Hall that I never swore on the former trial that they were in the cyclone pit together. I did not tell him that three or four days after the trial, at our house. I reckon I ceased visiting her on account of this trouble with Albert O'Neill.

Della Hill: Mary Hall and John Duke were not in the bottom of the cyclone pit. They went into a little house over the entrance to the pit. My sister Louella, Mary Butler, John Duke and Mary Hall were there. We all staid there together five or ten minutes. When we left, we left John Duke and Mary Hall in the pit. They staid in there about five or ten minutes, I reckon. We, all that came out, went down to Mr. Hall's. Sister Louella and Minnie Butler asked them to come out. After we got down to Mr. Hall's, it was not more than five or ten minutes, I reckon, when they came out.

Cross-examined: We did not go into the bottom of the pit; we went into the little house over the entrance to the pit. Miss Mary Hall was standing there on the steps; that is where I left her. I did not see her go into the pit. There was no floor, there was just steps in there. I had as good opportunity to see her as my sister.

Anderson Maddox : I was with Miss Mary Hall a couple of times, I believe. I attended her to a party at William Duke's ; we were in a two-horse hack. We returned from the party in the night, along towards day. I was with Mary Hall; she was on the same seat with me. Albert O'Neill and Miss Della Hill were also in the hack. After we started back from the party, Mary Hall kind of leaned over on my shoulder, and I

spoke to her and said, "You can't rest well that way; lay down in my lap," and she did so. She remained in my lap a right smart while, until I made her get up, until I got tired of it. We staid at the party pretty late. I suppose it was between two and four o'clock that it occurred. I can't answer positively as to the time it was; it was either the last of December, 1886, or the first of January, 1887. I was in her company after that; accompanied her from singing one night at James Hill's; it was two or three weeks after the buggy ride; it was in the night-time. The moon was giving light some. We had not gone far until I unbosomed her bosom in front and let her breast out, and was playing around. She didn't say anything against it; she never made any objection at all. The first of the year 1887, I was at her house one night, and her and a young man was in the kitchen by themselves, and I walked in there. When I got to the door, everything seemed very quiet in there; and I thought to myself I hadn't better go in without making an alarm. I stamped my feet on the step and walked in the door. The young man that was with her turned around with his back from the fire. There was no light in the room, except a few chunks in the fireplace. He kind of turned around with his face to the fire; his pants were unbuttoned. No one else besides him and Mary Hall was in the kitchen when I went in. The young man was John Duke. That was in January, 1887; it was somewhere between 8 and 10 o'clock in the night.

Cross-examined: I went to the party with Miss Mary Hall. We started from James Hill's. The party was eight or nine miles from there. I was on the front seat. I had to do the driving. I could use one hand in hugging the woman and drive with the other. One of the team was a mule, and the other a horse. She was on the left side. I hugged with first one and the

other hand. I drove a part of the time with my left hand. Albert O'Neill was behind me. I suppose he was awake; I don't know whether he was or not. I don't remember speaking one half dozen words to him after we left the party, until we left the ladies. I don't suppose the young woman with him was asleep, because part of the time she was singing. She was singing while I was hugging that woman. I suppose she could see all I did. Miss Hill is a nice young lady. I was hugging this girl before Miss Hill. When sworn in the justice court, I told them I accompanied her from the singing. I did not say anything about it on that trial. I did not see any necessity of it; they didn't ask me about it. I tell it now because I want to. I was there as a witness for O'Neill. I can't go back and tell now what I did swear. I swore what I told to be the truth. I understood it to be that what I stated would be true. There was no one with me that other night except Mary Hall. I don't remember who I first told about it, what happened. It seems that I told somebody. I don't know who I did tell. I told a friend in Marietta about it; his name was Morris. I told Albert O'Neill about it. I told him about it less than a week ago. I can't be positive that I never told him before. I have talked to O'Neill about this matter but a few times. I live about ten miles from him. His father and my father are cousins. I don't know what that makes. I am not sure that I never mentioned it to him until last week. I don't remember saying anything about it until a few days ago. I was subpœnaed by O'Neill because I suppose he knew I had been with this girl. Albert O'Neill never told me that he had intercourse with this girl. I asked him about it one or two different times. I did not swear just now that I never talked to him until last week about it. I said I never told him about going with this young lady from

that singing until then. I don't know how often I
have talked with him about the case. I made an affi-
davit in this case; I gave it to Albert O'Neill. I can't
tell you exactly the time last year; some time in June,
July or August; somewhere along there; that is my
best recollection. It may have been in September. I
am pretty sure it was in July or August. O'Neill
wanted my affidavit; he carried me before the justice of
the peace in Marietta, and I gave it to him. I couldn't
swear that he told me what he wanted with it; I don't
remember what he said he wanted with it. I don't
know that he told me he wanted that affidavit to keep
this case from court. I don't know that he did, nor do
I know that he did not; I don't know very much about
that at all; I haven't studied about it since that day.
I don't know that I stated in that affidavit anything
about feeling of this woman's breasts; I can't swear
positively as to that, because I don't remember. I don't
know what I done with the affidavit; I never had it in
my hand; the justice of the peace had it in his hands
when I last saw it; I know O'Neill went to get it; I
don't know whether O'Neill took it off with him or
not. I was at work at the marble works; he came
there, and I stepped out to the railroad and gave him
my testimony and walked straight back to my work.
I swore I made an affidavit for O'Neill; I guess he got
it; I made it for him; I believe he told me he got it.
I went before the justice of the peace to swear some-
thing I knew. I can't tell what I put in the affidavit.
I had a conversation with Mr. Hall, but I don't know
that I told him then about what I knew in this case. I
don't know that I told him that I didn't know anything
derogatory to his daughter's character. I know I had
a chat with Mr. Hall, but don't remember what I said.

Della Hill, recalled: I remember the occasion of
going from a party at Mr. Duke's; I was along. I

saw Mary Hall lay her head in Anderson Maddox's lap. It was in the night. Anderson Maddox was sitting with Mary Hall; Albert O'Neill was sitting with me.

Cross-examined: Albert O'Neill was visiting me at that time. I don't remember how long he visited me after that. We saw what Maddox and Mary Hall were doing. Of course I thought it was improper. I visited her after that because I was afraid of her; I did not go as often as before; I did not go frequently. I did not tell anybody about this for right smart while. Only my mother knew I was going to see her. She knew that sister visited her.

William Brooks: I know Mary Hall. I live in Bell's district, in Cherokee county; have been living there about twelve years.

Cross-examined: I saw John Duke for one man. I don't think that would criminate me. I saw John Duke have intercourse with her on the road from a party at Bill O'Neill's; it was near three years ago, I suppose. They were on the road; right at the road, not in the road but right at the edge of the road; they were standing up. I was by myself at the time; it was between eleven and twelve o'clock at night, I suppose; about midnight. A good many came up the road a quarter of a mile, I reckon; then the crowd sort of scattered off. John Duke is here I reckon. I was not asked anything about this in the trial before the justice of the peace; if I was asked if I ever saw anybody have anything to do with her, I don't remember it. I don't know that I refused to answer because it might tend to criminate me. I was not asked the question in the justice court. I don't know that I ever told any one about this thing. I never told Albert O'Neill about it; never told any of his folks about it. I don't know how I came to be subpœnaed. I did not tell a living soul about that. Albert O'Neill talked to me about being

there (at Hall's). I don't know that he ever told me he had sexual intercourse with her in full. He has talked to me about being there. I don't know that he told me that he had to do with her for certain, but he passed a remark about being there. He never did tell me that he had ever done anything to her. He spoke about the girl. They had a place named "Tucker's hollow;" the boys had the place named that. I heard him say something about being there and having a time with her. I don't know whether I hardly remember what he said or not. He said he had been there, may be Tucker's hollow, and had a good time with the girl he met up there. I don't know what he thought I understood about it. I can't swear positively that he made me believe he had intercourse with her; but of course a person would have thought he sort of hugged her, or something that way. He never told me he had intercourse with her. He told me he had been over there and talked with her, and told me he had hugged her and felt of her titties and such as that, and having a good time with her. He talked with me about the bench. I believe he said he had sexual intercourse with her on that bench, to the best of my knowledge; that is my best recollection. It was about three years ago he told me this, to the best of my memory; it was between two and three years ago. I do not remember all that passed about it. To the best of my recollection, I think the time O'Neill told me about it was the fall of 1887; it has been between two and three years ago. I said I saw John Duke have connection with her on the side of the road.

John Duke : Atlanta has been my home for most of this year. I moved away from Cherokee county about four years ago, in the latter part of the fall of 1885, if I mistake not. I saw Miss Mary Hall engage in sexual intercourse with a man, three years ago this coming

winter. If it please the court, I would rather not answer who the man was. It was myself; I engaged in sexual intercourse with her on that occasion.

Cross-examination : I believe it was about the last of December, 1886. It was between her house and where my brother-in-law lives, these places being about a quarter of a mile apart. It was in the night. We had been to a party at O'Neills. If I ever told anybody this, I don't recollect it. It was pretty dark; anybody would have had to be pretty close to have seen me. Were standing up ; if anybody saw us, I don't know it. I never breathed this to a living soul that I recollect of. I don't know how I came to be subpœnaed. My idea was, that I was with her a good deal, and they thought I knew something. I have talked to Albert O'Neill a good deal. I never told him what I would swear; I never intimated to him what I would swear. I don't remember making for Hall an affidavit that I did not know any man to have had anything to do with her. I can state to you what they have reference to : About the time that this thing was first generally understood through the country, that the girl was pregnant, I suppose that Mr. Maddox gave his interrogatories. Mr. Hall came to me at Acworth. ˙ In the first place, they told me that Mr. Maddox had said in his interrogatories that he had caught me in the very act, and Mr. Hall came to me and told me this and asked me if it was true, and I told him it was not. I did not tell him that I never had anything to do with her. I told him Anderson Maddox did not catch me at it. He asked me would I swear it; I told him I would. I did not tell him in presence of his son that I never knew anything improper on the part of this girl in my life. I don't remember signing an affidavit. I remember now what you have reference to : Mr. Hall asked me would I sign an affidavit. I did not sign one. I started to write one once.

I remember it now distinctly. I commenced it something like this, that I had known the girl from her childhood, and she was once under good character; fixed it up something like that. I did not finish the affidavit.

Re-direct: I know this handwriting (a letter purporting to be signed by Mary Hall). I have seen a right smart like it. I recognize this as the handwriting of Mary Hall.

Re-cross: We had a conversation previous to this letter. I agreed to make an affidavit. I never did promise him to make an affidavit that I never had anything to do with the girl. I had only reference to the one thing that Mr. Maddox had said.

William Crowder: Had a conversation with Caswell Hall in July, 1888, about this case. He said he had been watching Mr. O'Neill's family for a long time, and he had intended, if the time ever came when any of the family laid down a gap, he would lay it up, and that the gap was now laid down, and he said he was going to lay it up. He said he wanted revenge, and revenge he intended to have

Cross-examined: This was in July, 1888, before this woman gave birth to a child. He said she was pregnant then; he was talking about the matter. He was talking about Albert O'Neill seducing his daughter, and that he intended the guilty one to suffer, and said O'Neill was the father of the child; he said his daughter said so.

Prisoner's statement: Well, I never was with the girl in my life, and never went to see her in my life, and never had anything to do with her at any time; and what Mr. Brooks is talking about—he is entirely mistaken. I have been in the house a time or two, and went there on Sunday evening with Miss Della Hill, a girl I had been going with for two years, and went with

her until this trouble got up. I never was with this girl in my life, and never had anything to do with her.

John Hilly, for the State, in rebuttal: I never saw Albert O'Neill and Mary Hall together, not more than at a play or party. I saw him at her house a time or two, at a party or singing or something of that sort. I don't suppose I have been there over two or three times. Three or four years ago, Albert O'Neill told me he had a very good time on that bench. He didn't say anything only that; it has been about three years ago. I don't know what year it was. I haven't been with him any in about two years. It was in the fall of 1887. He just said he had a good time, and he supposed everything was going free, and he thought he might as well go over there and get his share. He did not tell me at any time he had intercourse with her. I could not say what O'Neill meant by what he said; he talked about that bench in the kitchen.

Cross-examined: I never visited Mary Hall any more than to be there at a singing or a party. I did not handle her person to amount to anything. I would kiss her, such as that, and squeeze her a little. I never put my hands on her person more than to hug her a little. That has been three years ago. I have seen John Duke there a heap of times in passing there Sunday evenings. I saw him three, four or five times; that has been about three years ago. I have seen Will. Brooks and Anderson Maddox over there.

George Hall: I have seen Albert O'Neill at my father's house. I saw him talking to my sister several times. I could not say how many times he visited her; several times. I would not be afraid to say twenty-five times. That was in the year 1888; it was year before last, along in the summer. My best recollection is, he went two or three months.

Cross-examined: He went there two or three months

in the summer, to the best of my recollection. Mr. Duke was not there that year hardly at all. I don't remember ever seeing him there at all. I was not at home part of the time; I was away from home almost every Sunday. I do not swear that Mr. Duke was not there that year. I don't remember seeing him there any time in 1887; if I could study about it, I might remember about seeing him there once or twice. Duke was there several times in 1886; I could not swear how many. I expect Duke was there twenty-five times in 1886. Anderson Maddox was not at our house many times in 1887. I can't swear he was at our house and how many times he was there. We had singings over there.

Re-direct: I heard a conversation between Father and John Duke about this matter; it was in 1887, I believe. Duke said he would write out his interrogatories and leave them for Pa; he said he would put in it that he was clear of knowing anything disrespectfully about my sister. Pa told him what Anderson Maddox said; and he said if Anderson Maddox told that on him, he would cut his throat.

Re-cross: That was in 1887; it seems to me it was in September, 1887; it was in the first of the fall of the year; it was about two years ago. We were talking about what Anderson Maddox said. Anderson Maddox had said what he swore on the stand, that he went into the kitchen where they were; and swore that his pants were unbuttoned. That is what we talked about when we saw John Duke. Father went to Duke to see whether he knew anything; and he said he did not. Duke said he would put in it that he was clear of knowing anything about her himself.

John Butler: I have seen Albert O'Neill at Mr. Hall's two or three times, if I recollect right; it was in 1887, along the last of the summer, I think. I think Miss Mary Hall has been out in society ever since they came here in 1883.

Caswell Hall, recalled: I remember the time that Mr. Maddox was said to have made an affidavit about this matter. I had a conversation with John Duke after that; it was about the time this trouble got up. George Hall was present. John Duke said it was a lie, and if Anderson Maddox accused him of the like of that he would cut his throat. He said he knew nothing about her character, that he had a good opinion of her, and gave her good advice every time he talked to her; and if she had gone astray, he was as clear of having anything to do with that woman as a child unborn.

Cross-examined: I went to see him about this matter that was stirred around. I had heard Anderson Maddox had given an affidavit in which he stated he had seen John Duke with my daughter. I went to see him about the whole matter. It was said it was John Duke's child; and I went to see him about it. I saw John Duke at Acworth. I don't remember how many times John Duke was at my house in 1886. He was absent then from my house during this whole racket; he was on the railroad, and was at my house once in the fall of 1887, but I don't remember what time it was; and he passed by and went over to Mr. Hill's. The state of my feelings towards the defendant is, to prosecute him in this court for his conduct. It is to run the extent of the law upon him as far as it is justice.

The jury found the defendant guilty. He moved for a new trial on the general grounds; because of error in admitting the testimony of Mary Hall that he was the father of her child (this ground not stating that such testimony was objected to); because of error in that part of the judge's charge which is quoted in the opinion; because of newly discovered testimony, hereafter stated; and because of error in excluding the following letters, dated February 8th, 1889, to John Duke from Mary Hall and her father, offered by the defendant to show the animus of the prosecution:

"Mr. J. R. Duke: I suppose you have run away from court. I don't know what made you do that way, when you was in no danger and knew what would be said when you left, and knew what was going to be sworn on you, and that you were clear, and knew that it would ruin me for you not to be here when W. A. Maddox swore what he did. We have had the trial, and they beat, and it was all because you run away. We are going to have another trial, and want you to file an affidavit that you are clear. Pa and the boys say we are ruined if you don't do that. Pa said for you to file an affidavit and send it back here. Pa said he would not believed you would done that way if every one had told him so. He said to tell you he had three cases against Joe if you did not do what you promised to. John, for my sake, please do what you can. I can't do anything without you. So I will quit. ·

MARY HALL."

"Mr. J. R. Duke: You have deceived me very much. I want you to send your interrogatories that you are clear of this of Mary, as you told me that you ' could swear you was; and John, you had better tend to this at once before court sits at Canton. Now sir, if you don't do this, you will be sorry. You have got me——and I will present Joe Duke in three different cases before the grand jury for toating concealed weapons. I will assure you if you stand up right, I will not do this; but if you don't, I will as sure as there is a God. You may depend on it..          CASWELL HALL."

The newly discovered testimony was by John R. Duke and G. L. Smith. Smith swore that in the spring of 1885, he escorted Mary Hall home at night from a singing, and on the way proposed to have sexual intercourse with her, and she replied that she could not do that, for if she did he would not keep company with her any more, and he said that would make him go more often; that she then asked if he would marry her if she consented to the intercourse, which he would not promise to do, and she said they could not have intercourse then, but for him to come back again and she

would talk to him on the subject; that after reaching the house they went in and he staid about half an hour, during which time she laid her head in his lap and he placed his hand under her dress in her bosom, to which she did not object, and upon his leaving asked if he was coming any more; that he withheld any information of the above facts until after the trial; that he was subpœnaed by Caswell Hall, and told him his evidence would do him no good, and on Hall's inquiring why he did. not want to be sworn, he replied that he did not care to tell his reason, after which Hall said he would release witness; and that after the trial he remarked that he had sense enough to keep his mouth shut, which remark was communicated to defendant's counsel, and the result was the procurement of this affidavit. Hall made an affidavit that he asked Smith what he knew about the case, to which Smith replied that he did not know anything at all for or against affiant's daughter, that he could not do them any good or any harm, and that he had told defendant he could not do him any good and did not know anything against the character of the girl. Duke's affidavit was to the effect that after the intercourse of which he testified on the stand, he had intercourse with Mary Hall a number of times in 1887, in January, March, May or June, in the summer, and several times afterwards; that he refused to tell any one about these things because he did not desire to subject her or himself to disgrace; that he was talked to by defendant and his counsel before the trial for the purpose of ascertaining what he knew about the case, but he would only reply that they would find out when he was put on the stand and he would tell the truth. The defendant and his counsel made affidavits as to their ignorance of the newly discovered testimony before the trial, counsel stating, among other things, that as Duke refused to tell him anything he knew

about tne case, he did not know what questions to ask him when on the stand. There were also several affidavits stating that Smith and Duke are veracious and of good character.

The motion was overruled, and defendant excepted.

J. J. NORTHCUTT, H. W. NEWMAN, C. D. PHILLIPS and CLAY & BLAIR, for plaintiff in error.

GEORGE R. BROWN, solicitor-general, by HARRISON & PEEPLES, for the State.

BLECKLEY, Chief Justice.

This case was tried before Judge WINN, since deceased; and the motion for a new trial was heard and denied by his successor, Judge GOBER.

1. The trial judge charged the jury: "Under the decisions of our Supreme Court, I leave it to you to say what a virtuous woman is. I charge you that a woman who has had unlawful sexual intercourse with a man is not a virtuous woman. As to allowing a man to kiss her and take liberties with her, as to her being a virtuous woman, I leave that to you. You can consider that as honest men, taking what you know about human nature and society people, and what they do and what they do not know. A thing that would be allowed in society in one place would not be allowed in another place. I leave that to you." The motion for a new trial complains of this part of the charge as erroneous, but fails to specify in what the error or errors consist. The opinion of Judge McCAY, as expressed in *Wood v. State*, 48 *Ga.* 289, was that the question of what is a virtuous woman ought to be left in each case to the jury; but the other two members of the court presiding in that case were of a different opinion. The charge to the jury then under review was in these terms: "The presumption of law is that the female alleged to have been seduced was virtuous, and that presumption re-

mains until removed by proof. She must have had personal chastity. If she, at the time of the alleged seduction, had never had unlawful sexual intercourse with man, if no man had then carnally known her, she was a virtuous female within the meaning of the law. If man had then carnally known her, had had sexual intercourse with her, she is not a virtuous female within the meaning of the law." This charge in its totality was expressly approved by Judge TRIPPE and Chief Justice WARNER. See pages 299, 304. These two judges being a majority of the court, their concurrence made the judgment of the court on the question involved; and nothing to the contrary having been decided, his Honor, Judge WINN, was mistaken in leaving it to the jury to say what a virtuous woman is. In so doing he was conforming to the individual opinion of one member, but going directly counter to the decision of the court; a decision in which all the members of the court as now constituted fully concur. We think that in contemplation of law, including the penal statute on the subject of seduction, every virgin, without exception, is virtuous. This is a plain, practical standard by which to test that chastity to which the law looks in classifying females who have never been married, and who have not been deprived of their virginity by violence or force without their consent. Of course, a different standard would have to be adopted in classifying women who have been married, such as widows and divorced wives. Possibly, also, a fallen woman who has reformed and been redeemed, and who has proved her redemption by years of abstinence and repentance, might stand on the footing, if not of a virgin, of a chaste widow. But for the purpose now in hand, we need not enter upon the consideration of exceptional cases. The broad general rule is enough, that unmarried females who are virgins are virtuous; and

those who, by their own consent, have ceased to be virgins, are not virtuous. This is the rule which should have been given in charge to the jury in the present case. It is for the court to construe the word "virtuous," as used by the statute, and the jury should receive and abide by that construction as decisive.

2. But while the jury have no right or power to decide that a virgin is not a virtuous woman, it is their province, and theirs alone, to decide from the evidence whether the female alleged to have been seduced was a virgin at the time she yielded her person to the accused. And upon this question, all facts and circumstances tending to show a debauched mind, such as lewd conduct and behavior before that time, may be considered ; for the jury need not have direct or positive evidence of her previous connection with some other person, but only such evidence as satisfies them that she had parted with her virginity. Of this opinion were all the judges who presided in *Wood* v. *State*, 48 *Ga. supra.* Judge TRIPPE (page 299) said: "The proof of lascivious indulgences and wanton dalliances, with other evidence short of direct proof of the overt act, may authorize a jury to infer actual guilt, the illicit act." Judge WARNER (pages 307, 308) said : " When a defendant is indicted on the criminal side of the court for seducing a virtuous unmarried female, it is not a good legal defense for him to *blackball* her character by proving loose declarations, imprudent or immodest conduct on the part of his victim ; but he must go further, and prove that she had lost her personal chastity prior to his alleged seduction of her, or he must prove such facts as, under the law, would raise a violent presumption that she had done so, such facts as, under the law, would authorize a jury to find that she had had unlawful sexual intercourse with a man." In these views we concur. The jury should pronounce the woman not virtuous upon any evidence,

direct or circumstantial, which convinces their minds that she had previous illicit sexual intercourse; but without such evidence, they should treat her as virtuous, for in contemplation of law she is so.

3. Upon another question, to wit, whether the woman was *seduced* by the accused, or only joined with him in the gratification of lewd and lascivious desire, not excited by his arts and importunities, but having its roots in her own depraved and debauched mind, the jury might consider all the facts and circumstances in proof before them going to show her want of moral chastity, although her physical virtue might be intact up to the time of the alleged seduction. We can conceive it possible that the law of chastity may lose its reign over the heart while the body remains pure; abstinence may be due chiefly to the want of opportunity. In such a case, the woman might fill the character of a seducer more than the man. At all events, she might be in such a state of readiness as to need only the form of seduction, without its substance, to win her consent. In saying this, we are dealing with a supposed case, without intending to intimate anything as to what we think, or as to what the jury should think, upon this subject in reference to the actual case before us. We only say that there can be no rightful conviction for seduction, although the woman may be a virgin, unless she has been really seduced; and that upon that question, her moral, as well as her physical, chastity is relevant. In this way the fine literary and poetic contrast of the seducer with his victim, which Judge McCAY calls up in *Wood* v. *State,* may have its proper application and influence. We think the English-speaking people have always classed women as virtuous, at least in their legal relations, until they have actually committed fornication or adultery. But these peoples, so far as we are acquainted with their habits of

thought, have ever recognized the fact that in both women and men there are many degrees of moral virtue, and that it requires little temptation beyond mere opportunity for those of the lowest degree to descend, sooner or later, into vice and crime. Still, the weakest of all weak virgins is under the protection of law against the seducer, and if her fall can be traced to actual seduction, the law will be, and should be, her avenger.

4. What was said in the extract above quoted from the charge of the court touching society people, what they do and what they do not know, is not altogether clear. It is certainly competent for the jury to use their knowledge of human nature and of the customs of society in their efforts to interpret conduct and judge of its indications. Whilst they can and ought to use this knowledge in passing on the question whether a particular woman is virtuous, etc., they have no right to use it to determine what a virtuous woman is, for as we have already said, that question is not for their decision.

5. The statute on which this indictment is founded reads as follows: "If any person shall, by persuasion and promises of marriage, or other false and fraudulent means, seduce a virtuous unmarried female, and induce her to yield to his lustful embraces, and allow him to have carnal knowledge of her, such person, on conviction, shall be punished by imprisonment and labor in the penitentiary for a term not less than two nor longer than twenty years. The prosecution may be stopped at any time by the marriage of the parties, or a *bona fide* and continuing offer to marry on the part of the seducer." The indictment charges seduction by persuasion and promises of marriage, and by other false and fraudulent means. The evidence shows that the promise to marry was made in September or about cot-

ton-picking time, and that the first intercourse took place in November. It fails to show that any persuasion was used or that any reference was made at the time of the intercourse to the previous promise, or that there was any repetition of it. Indeed, the evidence is an utter blank as to what occurred at the time of the intercourse, or anything immediately preceding it which led up to and resulted in the act. It is not even stated that the proposition for intercourse came from the accused. So far as appears, there was no solicitation, importunity or suggestion proceeding from him. No device, art, wile or contrivance is mentioned as used to draw or deceive into the forbidden act. No wooing, beseeching, imploring or appealing, by word, look or gesture, is disclosed or hinted at. Miss Hall testifies she was induced to have intercourse with the defendant because he promised to marry her. But she dates the promise in September, or about that time, and makes no allusion to any repetition of it on this momentous occasion. It induced her, but she does not say that *he* used it to induce her, nor what means he employed. We think that, before the jury could legally find that she was seduced, the means and process by which her seduction was accomplished should have been brought out in fuller light. As the evidence stands, she decides the case and only leaves the jury to adopt or reject her decision. We think she should have told the jury what she knew of the means and methods of her seduction, what the defendant said and did. Or, if he used persuasion by looks and gestures rather than by speech, this should have been told. It is evident to us that something has been kept back, or if not, that there was no seduction within the meaning of our code, but only illicit intercourse pending an engagement to marry. If she yielded simply because of that engagement, without his making any fraudulent and deceitful use of it to

procure her consent, the crime committed by both parties was fornication, not fornication by her and seduction by him. The statute requires something more than a promise of marriage followed by sexual intercourse, to make a case of seduction. There must also be persuasion or something equivalent thereto. The case of *Wilson* v. *State*, 58 *Ga.* 328, holds that repeating the engagement vow at the time of the intercourse implies persuasion, and under the language of our statute, that case goes quite far enough. The suggestion in the opinion that the word "and" might be read "or," so as to dispense with anything as a means of seduction other than a promise of marriage, was not acted upon in the case, and was not well-considered. We think it is not to be adopted, for the plain reason that, if the legislature had desired to make the promise alone sufficient, they could and would have said so. Some of the States, we believe, have enacted statutes of that kind. Our conclusion is that there ought to be another trial, so as to bring out all of the facts fully, and if other means besides a mere promise to marry were employed to induce consent, they should be made to appear. Upon the state of the evidence adduced at the trial, to say nothing of the newly discovered evidence, we could not feel justified in upholding the verdict of guilty. If there is real guilt of this heinous and detestable offence, it certainly can be made more manifest than it has been made. No one can read the testimony of the principal witness, as it is set out in the record before us, without feeling morally certain that she knows more than she has told. We can comprehend the modesty and reluctance of a female witness in dealing with a topic which must be to her both tender and repulsive; but our compassion for her feelings should not hinder us from demanding sufficient evidence for consigning a man to the penitentiary.

In the other matters set out in the motion for a new trial, we discover no error.        *Judgment reversed.*