## THE STATE V. THORNTON.

DIVISION TWO.

1. **Criminal Law:** SEDUCTION UNDER PROMISE OF MARRIAGE. The evidence in this case *held* sufficient to authorize the submission to the jury of the question whether defendant was guilty of seducing and debauching an unmarried female under eighteen years of age, under promise of marriage.

2. ——— : ——— : PRIMA FACIE CASE. When the state proves the age of the female, her good repute, the promise of marriage, and the seduction by virtue of that promise, a *prima facie* case is made for the jury.

3. ——— : ——— : DEFENSE. The defendant may then show want of chastity as a defense.

4. **Evidence:** ILLICIT INTERCOURSE. The fact of illicit intercourse need not be shown by direct evidence; it may be inferred from facts and circumstances.

5. **Female Chastity.** A woman may have been guilty of illicit intercourse, and subsequently become chaste in legal contemplation.

6. **Criminal Practice:** SUBSTITUTING JUROR. A defendant in a criminal case may consent to the substitution of a juror for one already selected and sworn.

7. **Appellate Practice:** IMPROPER REMARKS OF PROSECUTING ATTORNEY. An appellate court will not interfere with the discretion of the trial court in denying a new trial because of the improper remarks of the prosecuting attorney, unless the record clearly shows what the alleged prejudicial remarks were, and the circumstances under which they were made.

*Appeal from Montgomery Circuit Court.*—HON. E. M. HUGHES, Judge.

AFFIRMED.

*N. C. Dryden* for appellant.

(1) The court erred in excusing the juror Slavens, and in substituting for him Sabourin. (2) On the testimony of the prosecutrix, the defendant ought to have

been declared not guilty by the court; clearly the jury ought to have found him not guilty. *State v. Reeves*, 97 Mo. 668; *State v. Wheeler*, 94 Mo. 252; *State v. Patterson*, 88 Mo. 88.

*John M. Wood*, Attorney General, for the State.

(1) It was not necessary for the indictment to state that the defendant agreed to marry the prosecuting witness. (2) The objection to the substituted juror was not made in the original motion for a new trial, but in a supplemental one, filed more than four days after the trial. It cannot, therefore, be considered. *State v. Brooks*, 92 Mo. 591. (3) There is a material difference between this and the *Reeves case*. In the *Reeves case* there was no evidence of any former courtship; it seemed to be merely a "business transaction," a "bargain," a "barter;" but in this case a courtship existed, an offer of marriage and acceptance preceded even an attempt or offer of seduction, arrangements were made for the marriage and a postponement thereof before the seduction. Defendant had gained the confidence and love of the girl; she said: "I loved him better than my mother." He had told her how he had polluted his dead wife before marriage, he had worked with her for months, and finally he seduced her by these promises, he corrupted her, he deceived her, drew her aside from the path of virtue she was pursuing, as shown by the evidence of her neighbors.

THOMAS, J.—The defendant was sentenced to imprisonment in the penitentiary for two years, for seduction under promise of marriage, at the June term, 1890, of the circuit court of Montgomery county, on change of venue from Lincoln county, and the case is before this court on defendant's appeal.

I. The first assignment of error is that the testimony of Alice Cook, the prosecutrix, shows she was

not seduced under promise of marriage within the meaning of the statute under which the indictment in this case was drawn. Her testimony was, in substance, to the effect that she and defendant became engaged November 1, to be married December 19, 1888. She says: "I did not marry him on that day, because he made improper proposals to me, and I would not give up, and he put me off on that account. The engagement continued from time to time till Christmas, but we were not married then. The engagement went ahead as it was, and he continued to visit me and to make improper proposals to me, and, after so long a time, he kept up his proposals for three months, from December until March, and he said there was no use waiting any longer, that as soon as he accomplished what he wanted, he would marry me right away, and he said he would not until he did, but as soon as he did he would marry me, and so I gave up to him. He said he would not marry his first wife until she done the same thing, and she done it, and he married her. He said he would not marry me or any other girl if she did not do the same thing, and I had confidence in him that he would do what he said he would do, and I gave up to him. I had intercourse with him in my father's house. He proposed that I should come to his bed. He planned everything himself. He said he would wait until all the folks had gone to sleep, and then he would wake me, and then I was to come to him, and he done so and I went to him. His bed was on the floor; father's bed was over there, and mine was here, and his was over there. (Indicating.) Well, he accomplished his act, what he proposed, and had sexual intercourse with me, and after that he continued to visit me just the same. I had intercourse with him twice after that at the same place, in my father's own room. The first time I had intercourse with him was on the tenth of March, 1889, and the second time was about two weeks after that, and again about a month, I suppose, after that. That

was all the times he ever had intercourse with me. I became pregnant, and, afterwards, gave birth to a child on the last of December. The child was born dead, and was well developed. I never had intercourse with any other man. I was seventeen years old on the nineteenth day of December, 1888."

The prosecutrix was shown to be of good repute. Her mother and father testified that defendant asked their permission for him to marry her, which they gave. At the time of the alleged seduction, defendant was boarding at the girl's home, which consisted of one room. The defendant offered no evidence whatever to contradict the testimony of the prosecutrix as to her seduction, or to contradict or disprove the testimony of the prosecutrix and her mother and father as to the promise of marriage, nor the testimony as to the good repute of the prosecutrix at the time of, and prior to, the alleged seduction. There was some evidence tending to prove improper conduct, but nothing criminal on her part, toward one Price Hill, several months after the alleged seduction, but Price Hill and the girl deny that she was guilty of the conduct charged.

Upon this state of facts the court is asked to declare as a matter of law, that defendant is not guilty of the crime with which he is charged. The contention is that the prosecutrix bartered her chastity to defendant as the price of the marriage, and because *she* did this *he* committed no crime.

In the case of *State v. Eckler*, 106 Mo. 585, we had occasion to consider the identical question here presented, and we came to the conclusion that a man is guilty of the crime of seduction under promise of marriage, when the female yields to sexual intercourse by reason or by virtue of the promise of marriage, and would not have so yielded except for the promise. After a careful review of the reasons given and authorities cited in the *Eckler case*, we adhere to the doctrine there laid down. In some respects the conduct of the

The State v. Thornton.

prosecutrix in this case is more reprehensible than of the prosecutrix in the *Eckler case*. She showed more deliberation in getting out of her own bed and going to that of defendant according to arrangements previously made.

But, in some respects, the facts in this case make the defendant's conduct more reprehensible than that of Eckler. In the *Eckler case* the female was over twenty years of age. In this case the female was under eighteen. In that case the evidence outside of that of the prosecutrix as to the promise of marriage was very meager, and defendant went on the stand as a witness and denied making such promise. In this case the promise of marriage was proven positively by the prosecutrix, her mother and father, and *there was not a particle of evidence on the defendant's part to the contrary.* In that case the state in the first instance did not prove the good repute of the prosecutrix, and, in rebuttal, the evidence of her good repute was not strong. In this case the state proved by several witnesses that the prosecutrix was of good repute, and not a single witness in the case on either side testified to the contrary.

We will not repeat here what we said in the *Eckler case*, but will supplement what was there said with a further discussion of the principle involved and a citation and review of other authorities in support thereof.

Judging from the tone of the argument of defendant's attorney we conclude he has misconceived the whole scope, intent and purpose of the statute under which defendant was indicted. His argument conveys to our minds the idea that the statute was intended to *avenge* the wrongs of the seduced female. This is not the object of the statute. We rejoice that the element of revenge in punishment inflicted by the state has been eliminated by all systems of enlightened jurisprudence of to-day. The state punishes, and has a right to punish alone, to prevent crime and protect society. So far as the seduced female is concerned she is ruined, with a

bare possibility of restoration in some degree to society. The law cannot restore what she has lost, nor can it compel defendant to restore it.  *Her* wrongs are unredressable.  This statute was intended to punish seducers, under promise of marriage, and protect the homes of the innocent, the unsuspecting, the confiding daughters and sisters of our people.  Alice Cook is termed by defendant "a hot, brazen, lascivious, lying, perju:ed woman," and her conduct on the night of her debauchment is portrayed in vivid, we might say lurid, colors. She agreed to get up and go to defendant's bed to have intercourse with him upon a signal to be given by him. He gave the signal and she went.  Here is the attorney's impassioned arraignment of this conduct of the girl: "Is it a pure woman who leaves her bed in the sacred presence of father and mother under the holy roof of home and pollutes the altar of domestic life with the gratification of her debased and brutal desires ?"

We all say she did wrong, sinned grievously, and grievously has she paid the penalty.  Nature and society and her conscience have laid heavy burdens upon her.  She lost her lover in whom she confided; she bore the pains of pregnancy and then went down almost into the valley and shadow of death in passing through the terrible ordeal of maternity.  She brought shame and disgrace upon her parents and sisters, and she is now, no doubt, a social outcast, with no hope for the future.  But how is it with the defendant?  He promised this girl of seventeen to make her his wife, and from November to March plied her with his pledges of love and promises of marriage to induce her to yield to his embraces.  He succeeded finally.  What punishment has he received?  None except such as a guilty conscience inflicts.  Did *he* commit no crime because the girl consented?  Her consent is no excuse, for the statute *ex vi termini* implies that the consent of the girl is obtained.  If she does not consent, intercourse with her is rape.  Her consent is no defense because

the statute was intended to protect females who had not reached years of such maturity that they could realize the magnitude of the offense of illicit intercourse, could realize and appreciate the risks they take by such intercourse or could realize and appreciate that "a man might smile, and smile, and be a villian." It is no crime to seduce a woman over eighteen years of age under promise of marriage. Why? Because the statute has not so declared. The theory of our statute is that a woman having reached that age is capable of taking care of herself. If a man, standing in a confidential relation to a female under eighteen years old, defiles her, he is guilty of crime though she consent freely to gratify "her debased and brutal desires." Her consent is no defense. If a man has intercourse with a girl under fourteen, it is rape, and a capital crime. Her consent is no excuse or defense. In all these cases the theory of the law is that the female is incapable of giving a full, free and matured consent to the surrender of her virtue.

Defendant played a false part. He made a *false* promise of marriage to the girl. Did she have "debased and brutal desires?" Then why the necessity for a *false* promise of marriage, or any promise at all, for that? She confided in him. He deceived her. She had faith in his promise. He debauched and then betrayed her. Call you that no crime against her?

But this controversy is not between Alice Cook, on one side, and the defendant on the other. It is the state that complains, not for the purpose of avenging the wrongs of Alice Cook, but to preserve the morals and good order of society. Did the defendant commit a crime against anyone else but the girl, for which the state ought to interpose? Let us see. Alice Cook lived in a very humble home, indeed, as is evident from the testimony in this record. She worked out as a domestic servant. Mother, father, three girls and the defendant all slept in *one room*. The mother of the girl, when

defendant asked her for her daughter, requested a loan of him of $3 to prepare the wedding feast, which loan he agreed to make.    This home, though an humble one, was, no doubt, as dear to its occupants as the palaces of the rich and great are to them.    The defendant entered this home.    He found a chaste young girl there, just seventeen, for the jury in this case have certified to us, under their oaths and the instructions of the trial court, that she was a virtuous girl.    She was full of hope for the future.    He promised to marry her, for this fact was also certified to us by the jury that tried the case. From November 1, 1888, to March 10, 1889, he tried to entice her from the path of virtue, and until the last-named day she resisted him.    He told her all along that he would not marry her if she did not yield to his desires ; that he required the same thing of his first wife, who yielded, and he married her.    She swears, "I had confidence in him that he would do what he said, and I gave up to him.    I put more confidence in him than I did in my own mother.    I loved him, and my only idea was to win him, and he said that was the only way, and I was willing to do anything to win his affections."    He was to give her a signal when to go to his bed.    The whole family, including the girl, went to bed and went to sleep.    The defendant alone remained awake.    He gave the signal, and the girl went to his bed, and submitted her person to his unlawful embraces.    Did he commit no crime against that home, which he polluted and des-ecrated, against that father and that mother, whose guest he was, and against Alice Cook's younger sisters, and against society ?

The question is not whether Alice Cook did wrong. The question is whether defendant has committed a crime or not.    The state could have provided a punish-ment for Alice Cook's act, if it had seen proper.    That act was immoral.    She committed a fearful wrong against herself. her mother and father, her sisters, her home ; but defendant committed a fearful wrong, too,

against all these, and he induced his victim to join in the perpetration of this great wrong by importunities continued from November to March, and by making a *false* promise of marriage. The state has not seen proper to declare Alice Cook's act under such circumstances a crime, upon the ground, no doubt, that nature and society have laid burdens upon her heavy enough to atone for her fearful mistake. Shall we fold our arms and look complacently on the scene that was enacted in that humble home of the Cooks in Lincoln county, on the tenth day of March, 1889, and say to defendant, It is true you won the love and affection of this girl of seventeen; it is true you made a *false* promise of marriage to her, never intending to keep it on your part; it is true the girl believed you, confided in you, thought you would be true to her and consummate the marriage; it is true you importuned her for over four months to yield to your desires, urging your *false* promise as a justification for her yielding, by which you finally obtained her consent; it is true you got up and gave the signal to the girl to come to your bed; it is true you desecrated and polluted that humble home, broke faith with the mother and father as their guest, robbed the girl of that which you had no power to restore to her; it is true that afterwards you betrayed and deserted the girl, leaving her pregnant, with nothing but shame for the past and despair for the future; it is true we now look upon a ruined woman, a desecrated home with all the sorrow and grief attendant upon them; it is true this is all the result of your broken promises and plighted faith, but you have committed no crime of which we can take cognizance, because this girl ought not to have believed you; because this girl ought not to have confided in you, ought not to have trusted you? We cannot do this. Justice forbids it; the very terms of the statute itself forbid it.

There is a difference of opinion how far the doctrine of *volenti non fit injuria* should be carried in civil cases, but nearly all are agreed its application in criminal jurisprudence is limited. There are two schools of philosophy in regard to the functions of government. One leaves individuals to the inexorable, fatalistic law of " the survival of the fittest," and is crystallized in the proverb, " Every fellow for himself, and the devil take the hindmost." This principle finds its highest and most perfect application among the Fiji Islanders. The other finds expression in the principle that " the injury of one is the concern of all," and is most perfectly exemplified and applied in the nations of western Europe and the United States.

How far the government should go in the protection of one person against his own folly or weakness or inexperience is of course a mooted question, and will, no doubt, remain a mooted question for centuries to come, if not for all time. We have not fixed any definite limits yet. But the government now does by its civil and criminal laws constantly interpose in many cases to protect men and women against their own folly, weakness or inexperience, and this, too, in defiance of the doctrine of *volenti non fit injuria*. Only a short time ago did we, by a unanimous opinion in the *Burgdoerfer case*, sustain a law whose sole object was to protect men against their own folly, weakness and inexperience. The pool-seller under that law is guilty of crime, though he sell to willing buyers.

Men, educated and chivalrous men, brave men of experience, cannot voluntarily consent to the infliction of injury upon their persons. It is made a felony to fight a duel. If men who have reached years of maturity, men of experience and learning, cannot consent to the infliction of a wound upon their bodies, much less can a girl, seventeen years old, consent, in its legal sense, to the pollution of her body, and the

infliction upon her of a greater wrong than any mere physical injury can possibly be. In such cases, and in many others that could be presented, the state claims and exercises the right to interfere, aside from any question of fraud or false pretense or deception or oppression. The right is claimed and exercised upon the ground alone that it ought to preserve the public morals and to keep the peace, and such acts are punished, not because the parties concerned do not consent, but because they are crimes against society.

At common law the parent has a right of action against the seducer of his daughter, though the latter freely and fully consent, and in such action he can recover damages not only for the loss of services of the daughter, but also for distress of mind sustained by being deprived of the society and comfort of his child, and the dishonor he receives on account of her defilement. Hence, we find a distinct recognition, in law, of the wrong the parent sustains apart from, and not dependent on, the wrong the daughter receives. A money penalty is, however, inadequate to the offense of seduction. This consideration has led to the enactment in most of the states of laws which make illicit sexual intercourse punishable under certain circumstances as a crime. Our statute reads, "If any person shall under or by a promise of marriage seduce and debauch any unmarried female of good repute under eighteen years of age," he shall be guilty, etc. Prior to the revision of 1889, the age of the female was fixed at twenty-one years. This provision in all essential particulars exists in New York, Iowa, Minnesota, Virginia, Wisconsin, Oregon, Indiana, Mississippi, Texas and Pennsylvania, except in some of them the age of the female is immaterial. We reviewed in the *Eckler* case the decisions in New York and Indiana construing the statutes in those states, from which it will be seen that, if the female submits to carnal intercourse by reason and in consideration of the promise of marriage, the crime is complete.

In *State v. Moore*, 43 N. W. Rep. 273, defendant and the prosecutrix had had illicit intercourse for more than a year, when defendant went away and prosecutrix reformed, so she swore, and led a chaste life, until after defendant's return in about a year, when their relations were resumed. The supreme court of Iowa on this state of facts says: "The evidence abundantly shows that not only the first act of sexual intercourse, but the act of July 25, 1885, was accomplished by the most solemn promises of marriage," and it was held that this last act of intercourse having been had under promise of marriage made defendant guilty of seduction within the meaning of the statute.

And again in *State v. Bell*, 44 N. W. Rep. 244, the supreme court of Iowa uses this language in reference to this crime: "Some stress is laid upon the claim that the prosecutrix was older and more experienced than the defendant. They were both of mature years, he but little younger than she, and a widower with two children. Neither should be heard to urge want of age and experience in excuse of their wrong."

In *Commissioner v. McCarty*, 2 Pa. L. J. R. 351, Lewis, P. J., speaking of the Pennsylvania act in regard to seduction under promise of marriage says: "The act of the assembly was loudly called for by the frequent perpetration of this great public and private wrong. * * * Seduction by means of a promise of marriage is a grievous offense. The violation of such a promise may not differ in principle from other breaches of solemn engagements; * * * but there is a great difference in the degree of wrong inflicted upon society, and upon the individual who is induced to confide in the promise, and to surrender to her destroyer all that is estimable in woman, and all that makes her existence even tolerable. * * * It must appear to the satisfaction of the jury that the seduction was accomplished by means of a promise of marriage.

Seduction by any other means does not fall within the condemnation of the act."

The supreme court of North Carolina, in *State v. Horton*, 100 N. C. 443, held that the statute contemplates a seduction by means of a promise of marriage in the nature of a deceit. Consent is no defense if the seduction is proved.

In *State v. Timmens*, 4 Minn. 325, it appeared the prosecutrix had carnal intercourse with defendant and claimed to have reformed, and then under promise of marriage repeated such intercourse with him. The court says: "When a man enlists the affections of a woman, and by promising to make her his wife creates between them the most confidential and sacred of relations, and by this means succeeds in obtaining from her concessions, sinful and impure, it is true, but from their very guilt proof of the depth of the love and confidence which extorted them, and aggravates his treachery by continuing before his victim the delusive hope that he will yet redeem his pledge, and thus compels her to yield anew, until at last his infidelity is rendered certain by his marriage with another, and she in the despair of exposure and shame calls him to an account before a court of justice, the law will be slow to permit him to object, that by reason of her acts, continued perhaps to shield him from disgrace, she was a woman of unchaste character."

The supreme court of Texas, in *Cole v. State*, 40 Tex. 147, says: "The promise of marriage is an important element in the definition of the statutory offense, and it must appear that the female alleged to have been seduced yielded alone to the solicitation of the other party in consideration of his promise to marry her."

In Oregon, in the case of *Parker v. Monteith*, 7 Or. 277, it was held competent to prove that the defendant promised to marry plaintiff's daughter, when by reason of such promise he succeeded in seducing her.

The statute of Georgia on this subject is peculiar. It says that "if any person shall by *persuasion and promise of marriage,* or other false and fraudulent means, seduce," etc. Speaking of the crime denounced by this statute, Judge BLECKLEY, on behalf of the supreme court of the state, in *Wilson v. State,* 58 Ga. 328, says : "Where consent [to intercourse] is given, pending a virtuous engagement, in consequence of a repetition of a promise to marry already made and accepted, the woman yielding in reliance on the plighted faith of her lover, and intending that she shall trust and be deceived, the case is one of seduction. To make love to a woman, woo her, make honorable proposals of marriage, have them accepted, and, afterwards, to undo her under a solemn repetition of the engagement vow, is to employ *persuasion as well as promises of marriage.*"

In Michigan the statute reads : "If any man shall seduce and debauch any unmarried woman," etc., and speaking of this statute in *People v. DeFore,* 64 Mich. 693, the supreme court of that state said : "Under this statute, the offense is committed, if the man has carnal intercourse to which the woman assented, if such assent was obtained * * * by the man at the time, and to which, without such promise, she would not have yielded. * * * If she resists but finally assents or yields, induced thereto or in reliance upon the promise made, the offense is committed."

After a full review of the above authorities and those cited in the *Eckler case,* and after a careful examination of the evidence in this record, we have no hesitancy in holding that there was ample testimony to take the case to the jury, and the court committed no error in refusing to instruct the jury that defendant had not committed the crime charged.

II. The defendant certainly has no right to complain of the instructions, for the court went much further than the law justified it in favor of defendant's

theories of the case. The instructions, given at the instance of defendant, convey the idea that a woman may be unchaste in law, without having had illicit intercourse with anyone; that sexual desire strongly developed in her constitutes unchastity. We cannot subscribe to that doctrine. It must be observed here that our statute does not require the female to be chaste as the statutes of many of the states do; it simply requires her to be "of good repute." By our definition of "seduce," however, we have virtually inserted the element of chastity in the statute, and, as was said in the *Eckler case*, we do not desire to depart from that definition. But, when the state proves the age of the girl, the promise of marriage and the seduction and debauchment, by virtue of that promise, and that the girl is of good repute, it makes a *prima facie* case to go to the jury. The defendant can then show that the girl is not virtuous, and thus escape punishment. A want of chastity under our statute must be shown by defendant. Bleckley, C. J., of Georgia, gives the true definition of chastity in *O'Neil v. State*, 11 S. E. Rep. 856, as follows: "That unmarried females, who are virgins, are virtuous, and those who, by their own consent, have ceased to be virgins, are not virtuous." In another place he says: "This is a plain, practical standard by which to test the chastity to which the law looks in classifying females who have never been married, and who have not been deprived of their virginity by violence or force, without their consent. Of course, a different standard would have to be adopted in classifying women who have been married." And this definition has the support of other courts. *Kenyon v. People*, 84 Am. Dec. 177, and notes; *Andre v. State*, 68 Am. Dec. 708, and notes. The fact that a female has had illicit intercourse need not be shown by direct evidence. Like all other facts, it may be shown by circumstances, etc. We will add that a woman may have had

illicit intercourse with men and afterwards reform so as to become chaste in contemplation of law.    *State v. Patterson*, 88 Mo. 88.

III.    After the jury was impaneled and sworn to try the case, Mr. Avery, the prosecuting attorney, made his opening statement to the jury.    When Mr. Avery had concluded his statement, a note was handed to Judge HUGHES, who was presiding at the trial.    Judge HUGHES read the note, and said to the counsel for both sides, in the presence and hearing of the jury:    "Gentlemen, a member of the family of Mr. Ben. Slavens, one of these jurors, is very sick; his mother-in-law is about to die. Are both sides willing that he be discharged, and can you agree upon another juror; or will you have another full panel?"

Both sides consenting to the withdrawal of the juror, he was excused from the jury.    Mr. Hughlett asked Mr. Dryden, defendant's attorney, privately, if he consented to the excusing of the juror.    Mr. Dryden said:    "I propose to save the point."    Thereupon, Mr. Hughlett and Mr. Dryden went together to the judge, to whom Hughlett said:    "Dryden does not consent to this."    Judge HUGHES said:    "Mr. Dryden, I understood you to consent to the withdrawal of this juror. If you do not, I will call Mr. Slavens back and keep him on the jury and let the trial proceed."    Thereupon, Mr. Dryden said:    "I will consent, and will not raise the point."    The foregoing conversation between the judge and Dryden and Hughlett was not heard by the jury, but was private.    Thereupon, Mr. Hughlett said, in open court, and in the presence and hearing of the jury:    "Now, let us call jurors from the bystanders until a juror is found to whom both sides agree, and will serve in Slavens' place."    The defendant's counsel consented to this.

Thereupon, Frank Sabourin, the first man called from the bystanders, qualified, and was accepted by

both sides; after which the whole jury, including Sabourin, the new juror, was sworn to try the case. Defendant insists that his action in this connection was . constrained and forced, that the court erred in forcing upon him the alternative of excusing the juror Slavens, or incurring his displeasure by refusing to excuse him. The better course for a judge to pursue under the circumstances of this case would be to inform the attorneys for both sides of the situation, and ascertain their wishes privately; but we are well satisfied also that in an emergency, like this under review, the defendant has a duty to perform. The court asked the attorneys publicly in the presence of the jury, whether they would consent to the withdrawal of the juror, and they all consented. But it seems defendant's attorney had a mental reservation that he would "save the point." As soon as the court learned of this mental reservation the private colloquy above was had between the judge and the attorneys, the result of which was that defendant's attorney said, "I will consent, and will not raise the point." He had the power to waive an exception to the action of the court, and to consent to the substitution of one juror for another. *State v. Gilmore*, 95 Mo. 554; *State v. Robertson*, 71 Mo. 446. The rule in regard to saving exceptions is the same in criminal as in civil cases. *State v. Griffin*, 98 Mo. 672; *State v. Meyers*, 99 Mo. 107; *State v. DeMosse*, 98 Mo. 340; *State v. Rambo*, 95 Mo. 462.

The judge, if the exception had been saved at the time of the privy conference, could have assumed the responsibility of retaining the juror, and he could have done it consistently, too, and thus defendant would have been relieved of the dilemma in which he was placed by the judge's first remark. At the time no one supposed that the retention of Slavens on the jury would be of *peculiar* benefit to either side, and for that reason, no doubt, defendant's attorney said, "I will consent, and will not raise the point." Another

competent juror was called and accepted by both parties, and, it not appearing that defendant was prejudiced by this action of the court, it would be trifling with the administration of the law to undo the work of the court and jury, on the bare supposition that Slavens might have been more favorable to defendant's views of the case than was the juror who was substituted for him.

IV. Exception was taken to the speech of Mr. Hughlett, prosecuting attorney of Montgomery county. Nat. C. Dryden, Esq., and Mr. Robert Shackleford made affidavit setting out what Mr. Hughlett said that was objectionable. According to their recollection of the speech Mr. Hughlett made some remarks that were not calculated to add to the dignity and decorum that should characterize a temple of justice, but the latter made a counter-affidavit in which he denied saying the most of what the other affiants charged him with saying, and two other affiants supported him. The court overruled this objection without giving any reason for it and without certifying to us what Mr. Hughlett did in fact say. It is impossible for us from this record to determine whether the speech was what Messrs. Dryden and Shackleford say it was, or whether it was what Mr. Hughlett and those who supported him say it was. Interference with the arguments of attorneys should not be indulged, except where it manifestly appears the privilege has been abused, and whether it has been abused or not must necessarily be left largely to the trial judge who is in a position to know, in the first place what was said and the reasons for it being said, and in the second place to know whether remarks of attorneys have operated to the prejudice of the losing party. And especially an appellate court ought not to interfere with the discretion of the trial court, unless the record unequivocally shows what the remarks claimed to be prejudicial were, and the circumstances under which they were made.

Judgment affirmed. GANTT, P. J., and MACFAR-LANE, J., concur in the result on the ground that the case was tried in accordance with the previous rulings of this court, and do not desire to be understood as overruling *State v. Reeves* and similar cases.